***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Harris.
 *********** *Page 2 
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties before Deputy Commissioner Harris as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. On or about March 12, 2007, an employer-employee relationship existed between Plaintiff and Defendant-Employer Invista. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
3. On or about May 17, 1998, an employer-employee relationship existed between Plaintiff and Defendant-Employer Hoechst Celanese Corp. All parties have been correctly designated, and there is no question as to misjoinder or nonjoinder of parties.
4. The carrier on the risk on May 17, 1998 was Ace USA/ESIS Insurance Co.
5. The carrier on the risk on March 12, 2007 was Old Republic Insurance Co.
6. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Plaintiff's medical records
 • Exhibit 3: Industrial Commission Forms
 • Exhibit 4: Plaintiff's discovery responses
 • Exhibit 5: Plaintiff's employment file *Page 3 
Transcripts of the depositions of the following were also received post-hearing:
 • Jane Melton
 • Dr. William Stephen Furr (with Exhibit 1)
 *********** ISSUES
1. Whether Plaintiff's claims are barred by the limitations period of N.C. Gen. Stat. § 97-58 and/or the notice provision of N.C. Gen. Stat. § 97-22?
2. Whether Plaintiff has shown that her job caused and/or exacerbated her bilateral knee conditions?
 ***********
Based upon all of the competent credible evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before Deputy Commissioner Harris, Plaintiff was 51 years of age, with a date of birth of April 20, 1958. Plaintiff graduated from high school in 1976 and resides in Lexington, North Carolina. Plaintiff is 5'8" tall and weighs approximately 247 pounds.
2. The two Defendant-Employers named in these claims are different owners of the same yarn plant in Salisbury, North Carolina. Plaintiff began working at the plant on January 1, 1990 and continued working there into 2007. During the time Plaintiff worked at the plant, it changed ownership several times. Defendant-Employer Hoechst Celanese (hereinafter "HC") owned the plant as of the alleged date of onset in I.C. No. 865240 (May 17, 1998), and *Page 4 
Defendant-Employer Invista (hereinafter "Invista") owned the plant as of the alleged date of onset in I.C. No. 792279 (March 12, 2007).
3. The claim for May 17, 1998 is for the left knee, and the claim for March 12, 2007 is for the right knee.
4. Plaintiff was a spindraw operator at the Salisbury plant. She worked 12-hour shifts and frequently worked 60 hours or more per week. Her job was to run a large machine that produced yarn from raw material. The operators accessed the machine on three different levels, with steep, almost ladder-like steps leading from the lower level up to the second and third levels. "Packs" of the raw polymer were placed at the top of the machine on the third level, and the production process ran downward from there.
5. Plaintiff estimated that she went up and down the two flights of steps on average approximately 35 times per shift in the course of performing her job. Each flight contained approximately 15 steps. Plaintiff asserted that she had to lean over, often with pressure on the fronts of her knees, in order to perform adjustments and operations on the machine. Plaintiff also indicated that she was sometimes required to kneel, and she estimated that she spent a total of approximately 15 minutes on her knees during a 12-hour shift. Plaintiff did not wear knee pads.
6. In approximately 1995, Plaintiff began noticing pain and symptoms in both of her knees when going up and down the steps at work.
7. On August 2, 1995, Plaintiff presented to Dr. J. Simmons Riggan, an orthopedist. Plaintiff's chief complaint on that date was right knee pain and stiffness. Dr. Riggan diagnosed probable chondromalacia changes in the right knee medial compartment and released Plaintiff to follow up as needed. *Page 5 
8. Plaintiff followed up with Dr. Riggan on March 13, 1996, complaining of pain in both knees, with more crepitance and popping in the right knee. Dr. Riggan diagnosed bilateral chondromalacia in the knees, right greater than left. He injected Plaintiff's right knee and released her to follow up as needed.
9. On March 26, 1996, after the injection had helped with her right knee symptoms, Plaintiff had her left knee injected by Dr. Riggan.
10. After Dr. Riggan informed Plaintiff that she was having knee problems because she was obese she decided to seek treatment with another orthopedist, Dr. William Stephen Furr. Her first visit with Dr. Furr was on May 20, 1996.
11. At her May 20, 1996 visit with Dr. Furr, Plaintiff complained of left knee pain. She told Dr. Furr that she went up and down stairs a lot at work and often put pressure on her knees by leaning against them and/or kneeling, and that these activities aggravated her knees. As of Plaintiff's May 20, 1996 visit, Dr. Furr opined that Plaintiff's bilateral knee conditions were work-related, and informed Plaintiff that her job could be affecting both of her knees. Plaintiff agreed with Dr. Furr's assessment.
12. Plaintiff completed an application for long-term disability benefits through HC's plan on May 24, 1996. The form contained the heading, "Hoechst Celanese Corporation," and was faxed to Aetna, the disability carrier, from the human resources office at the Salisbury plant. In the application, Plaintiff made a claim for her "knees" beginning on May 20, 1996 and checked "yes" and wrote "think so" when asked "Is your illness or injury work related?"
13. An MRI performed shortly after the May 20, 1996 visit with Dr. Furr showed a medial meniscus tear with associated degenerative changes in Plaintiff's left knee. *Page 6 
14. Dr. Furr wrote Plaintiff out of work for her left knee condition and performed a left knee arthroscopy on June 27, 1996. Plaintiff remained out of work per Dr. Furr's orders from May 23, 1996 until October 28, 1996.
15. During her out-of-work period in 1996, Plaintiff drew short-term disability compensation.
16. Dr. Furr next saw Plaintiff on May 19, 1998, when she complained of more left knee pain. Dr. Furr performed a repeat left knee arthroscopy on June 18, 1998.
17. Plaintiff filed another short-term disability claim with Aetna in May 1998 for her left knee condition. The application was dated May 20, 1998, and Plaintiff again checked that the condition was work-related.
18. On or about September 18, 1998, more than two years after May 20, 1996, when she was initially notified by Dr. Furr that her left knee symptoms were work related, Plaintiff reported to Jane Melton, the workers' compensation administrator for HC, and reported that she wanted to make a workers' compensation claim for her left knee condition. Plaintiff told Ms. Melton that HC's group health insurer was now denying further physical therapy, and therefore, Plaintiff wanted to see if workers' compensation would help her. Plaintiff alleged that the date of onset for her left knee condition had been May 17, 1998.
19. There is no Form 18 filed on or about September 18, 1998, and there is a dispute between Plaintiff and HC as to whether Ms. Melton misled Plaintiff by representing that she (Ms. Melton) would file the Form 18 for Plaintiff. However, Ms. Melton did complete a Form 19 for Plaintiff's left knee claim on September 21, 1998.
20. The earliest Plaintiff alleges she filed a Form 18 for her left knee claim is September 27, 1998. *Page 7 
21. Defendants HC and Ace USA/ESIS denied Plaintiff's left knee claim, and Plaintiff did not pursue it further until 2008.
22. Following the June 18, 1998 left knee arthroscopy, Plaintiff returned to work in October 1998. Thereafter, she worked continuously in her spindraw operator job, at full duty, with no significant periods out of work, until March 12, 2007.
23. Plaintiff's job duties did not change during the period from October 1998 through March 2007.
24. Invista purchased the Salisbury plant on December 10, 1998.
25. Plaintiff continued to have pain and other symptoms in both knees, and the symptoms in her right knee gradually worsened. Plaintiff had sporadic further treatment for her knees with Dr. Furr over the years following the June 1998 left knee arthroscopy.
26. On March 12, 2007, Dr. Furr performed arthroscopy on Plaintiff's right knee.
27. On March 17, 2007, Plaintiff filed a short-term disability claim with Invista's carrier, Standard Insurance Company. In the "Employee Statement," Plaintiff indicated that she was filing because of "knee surgery," that her disability was not work-related, that she had not filed a workers' compensation claim and did not intend to file one. As such, Defendants did not have actual knowledge of Plaintiff's alleged occupational disease in her right knee. Furthermore, due to Plaintiff's failure to timely file written notice, Defendants were precluded from providing immediate medical diagnosis and treatment and from conducting an investigation into the circumstances of the alleged occupational disease around the time it occurred.
28. After her 12-week leave pursuant to the Family and Medical Leave Act was exhausted and Plaintiff could not return to work, Invista terminated Plaintiff's employment on June 5, 2007 per its policy. *Page 8 
29. Plaintiff drew short-term disability compensation in the gross amount of $426.96 per week from March 22, 2007 through September 7, 2007. She then drew long-term disability compensation in the gross amount of $1,846.60 per month from September 8, 2007 through May 31, 2008. Since June 1, 2008, Plaintiff has drawn long-term disability compensation in the gross amount of $369.60 per month. During her employment, Plaintiff paid premiums to the short-term and long-term disability plans.
30. Dr. Furr performed a right total knee replacement on July 2, 2007 and a left total knee replacement on September 29, 2008.
31. Plaintiff filed a Form 18 for her right knee condition on September 18, 2007, alleging a date of onset of March 12, 2007. Defendants did not have actual knowledge of Plaintiff's claim.
32. Plaintiff filed a Form 18 for her left knee condition on or about February 21, 2008. The form was styled as a "resubmitted Form 18 — original filed 9/27/98."
33. Plaintiff has not worked since March 12, 2007.
34. Plaintiff remains in out-of-work status per Dr. Furr following the knee replacements. Dr. Furr assigned a Permanent Partial Disability rating of 50 percent for each knee, and he believes she will need further treatment for her knees throughout her life.
35. Plaintiff never reported any specific injuries to either of her knees to Dr. Furr or anyone employed by HC or Invista.
36. Dr. Furr testified that any person required to climb stairs repetitively and be on their feet for up twelve hours per day "could be made symptomatic to knee complaints." However, Dr. Furr also stated that Plaintiff was obese and that her weight placed more strain on her extremities. When asked whether he believed that Plaintiff's occupation placed her at a greater risk of developing her knee conditions than the general public, Dr. Furr stated that the answer "depends on what you're considering a normal occupation." *Page 9 
37. Dr. Furr acknowledged that his opinion as to whether Plaintiff's job affected her knees was dependant on the description of the duties associated with her position. He originally stated that making between five and 100 trips up stairs per day would aggravate one's knees, however, later in his deposition he indicated that, if Plaintiff only had to go up and down stairs five times per day, this "would be a lot less aggravating than 100 times a day." As stated above, Plaintiff estimated that she went up and down the two flights of steps on average about 35 times per shift.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Regardless of whether Ms. Melton misled Plaintiff in September 1998 when Plaintiff first approached her about a workers' compensation claim for her left knee, Plaintiff's left knee claim was untimely filed. Plaintiff did not approach Ms. Melton or anyone else with HC or its carrier Ace USA/ESIS about a workers' compensation claim before September 1998. Plaintiff alleges she filed the Form 18 for her left knee claim on or about September 27, 1998, which was more than two years after Dr. Furr notified her, on May 20, 1996, that he believed her left knee condition could be work-related. This was also more than two years after her disablement due to her left knee condition began on May 23, 1996. As such, Plaintiff's left knee claim against HC and its carrier Ace USA/ESIS is barred by the statute of limitations contained in N.C. Gen. Stat. § 97-58(c). *Page 10 
2. Even though Plaintiff had long been on notice from Dr. Furr that her right knee condition could be work-related, she did not put Invista or its carrier Old Republic/Broadspire on notice of her alleged occupational disease in her right knee until she filed her Form 18 on or about September 18, 2007. This was over six months after the alleged date of onset of March 12, 2007, and it was after Plaintiff had undergone a right knee arthroscopy and a right total knee replacement with Dr. Furr. Defendants had no actual knowledge of Plaintiff's alleged right knee occupational disease. N.C. Gen. Stat. § 97-22. In fact, Plaintiff affirmatively represented in her short-term disability filing on March 17, 2007 that her condition was not work-related. Furthermore, Plaintiff has not shown a reasonable excuse for failing to provide written notice of her right knee occupational disease within 30 days after March 12, 2007, and Defendants were prejudiced by Plaintiff's failure to provide timely written notice. Id. As such, Plaintiff's right knee claim against Invista and its carrier Old Republic/Broadspire is barred by the notice provisions of N.C. Gen. Stat. §§ 97-22 and 97-58(b).
3. Furthermore, the undersigned conclude that Dr. Furr's testimony regarding the causation of both Plaintiff's left and right knee conditions is speculative and is insufficient to show a causal relation between Plaintiff's job duties and the development and/or exacerbation of said conditions. "In a workers' compensation claim, the employee has the burden of proving that his claim is compensable." Holley v. ACTS,357 N.C. 228, 231, 581 S.E. 2d 750, 752 (2003). N.C. Gen. Stat. § 97-53(13) defines an occupational disease as "any disease . . . which is proven to be due to causes and conditions which are characteristic of and particular to a particular trade, occupation or employment, but excluding all ordinary diseases of life to which the general public is equally exposed outside of the employment." In order to establish causation in a case where "the exact nature and probable genesis of a particular type of injury involves complicated *Page 11 
medical questions far removed from the ordinary experience and knowledge of laymen," a claimant must provide expert medical testimony which establishes causation. Click v. Pilot FreightCarriers, Inc., 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). "However when such expert opinion testimony is based upon mere speculation and conjecture, it can be of no more value than a layman's opinion. As such, it is not sufficiently reliable to qualify as competent evidence on issues of medical causation."Young v. Hickory Bus. Furn.,353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000). "The evidence must be such as to take the case out of the realm of conjecture and mere possibility, that is, there must be sufficient competent evidence tending to show a proximate causal relation." Holley v. ACTS,Inc., 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003).
4. In cases where medical testimony is required, "medical certainty is not required, [but] an expert's `speculation' is insufficient to establish causation."Id. at 234, 581 S.E.2d at 754. "An expert witness' testimony is insufficient to establish causation where the expert witness is unable to express an opinion to `any degree of medical certainty' as to the cause of an illness." Adams v. Metals USA,168 N.C.App. 469, 476, 608 S.E.2d 357, 362 (2005) (citingYoung v. Hickory Bus. Furn.,353 N.C. 227, 233, 538 S.E.2d 912, 916 (2000)). In Young, the North Carolina Supreme Court held that the employee did not prove that her fibromyalgia was work-related because her doctor could not "express an opinion to any degree of medical certainty as to the cause" of the employee's injury. 353 N.C. at 233, 538 S.E.2d at 916-17. The North Carolina Supreme Court "has allowed `could' or `might' expert testimony as probative and competent evidence to prove causation."Adams, 168 N.C. App. at 476, 608 S.E.2d at 362. "However, could or might testimony is insufficient to support a causal connection when there is *Page 12 
additional evidence or testimony showing the expert's opinion to be mere guess or speculation." Id.
5. After reviewing the results of an MRI of the left knee, and discussing treatment options with Employee-Plaintiff, Dr. Furr performed another left knee arthroscopy on June 18, 1998. In the course of performing the arthroscopic procedure, Dr. Furr noted osteochondral change of Plaintiff's cartilage and stated that "there may have been some minimal meniscal change." Dr. Furr explained that these changes "could have . . . been from whatever precipitated the original injury" or "could have been from some wear and tear from the postoperative surgical changes that [Plaintiff] had." Despite those possibilities, Dr. Furr testified that the cause of the osteochondral changes was most likely just slight deterioration from the symptoms with which Plaintiff originally presented in 1996. Dr. Furr also stated that Plaintiff's obesity made her "less conditioned than other people" and put more strain on her lower extremities. Additionally, Dr. Furr testified that 12 years elapsed during the course of Employee-Plaintiff's treatment with him, and that this amount of time represented a "pretty good long process," which was not necessarily hastened by her activities at work.
6. Dr. Furr's testimony establishes that Plaintiff's job duties did not hasten the deterioration of her knee condition, and that her knee condition could or might have been caused by her obesity. Therefore, Dr. Furr's testimony regarding the cause of Plaintiff's knee symptoms is not sufficiently reliable, and does not establish that Plaintiff's employment with Employer-Defendant placed her at an increased risk, relative to the general population, for developing knee symptoms. Furthermore, Dr. Furr's testimony does not establish that Plaintiff's work conditions caused her to develop an occupational disease.
 *********** *Page 13 
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's left knee claim (I.C. No. 865240) against HC and Ace USA/ESIS is hereby DENIED.
2. Plaintiff's right knee claim (I.C. No. 792279) against Invista and Old Republic/Broadspire is DENIED.
3. All sides shall bear their own costs. As part of their costs, if they have not done so already, Defendants Ace USA/ESIS and Old Republic/Broadspire shall split equally an expert witness fee to be paid to Dr. Furr in the amount of $1,515.25 or the amount actually billed, whichever is less.
This the 27th day of May, 2010.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/___________________ PAMELA T. YOUNG CHAIR
S/___________________ DANNY LEE McDONALD COMMISSIONER *Page 1